PETER J. BENVENUTTI (60566)
PETER J. CROSBY (115588)
JONES DAY
555 California St., 26th Floor
San Francisco, CA 94104-1500
Telephone: (415) 626-3939
Facsimile: (415) 875-5000
E-mail: pjbenvenutti@jonesday.com
          pjcrosby@jonesday.com

MARK S. KAUFMAN (Admitted *Pro Hac Vice*)
McKENNA LONG & ALDRIDGE LLP
303 Peachtree St., Suite 5300
Atlanta, GA 30309
Telephone: (404) 527-4120
Facsimile: (404) 527-4198 (-5937)
Email: mkaufman@mckennalong.com

Attorneys for Plaintiff
LEHMAN BROTHERS HOLDINGS INC.

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br>CENTRAL EUROPEAN INDUSTRIAL<br>DEVELOPMENT COMPANY, LLC d/b/a<br>CEIDCO,<br><div align=right>Debtor.</div> | Bk. No. 02-30419-11-DM<br><br>Chapter 11 |
| In re:<br>THE KONTRABECKI GROUP LP,<br><div align=right>Debtor.</div> | Bk. No. 02-30421-11-DM |
| ARON M. OLINER, as Chapter 11 Trustee of the<br>Kontrabecki Group Limited Partnership, and<br>LEHMAN BROTHERS HOLDINGS INC.<br><div align=right>Plaintiffs,</div><br>v.<br><br>JOHN KONTRABECKI, et al.,<br><div align=right>Defendants.</div> | Adv. No. 03-3264<br><br>**PLAINTIFF LEHMAN BROTHERS<br>HOLDINGS INC.'S <u>AMENDED</u>*<br>OPPOSITION TO MOTION OF<br>DEFENDANT JOHN<br>KONTRABECKI TO DISMISS<br>ADVERSARY PROCEEDING**<br><br>**Date:          December 18, 2009<br>Time:          2:30 p.m.<br>Dept:          22<br>Judge:        Hon. Dennis Montali<br>                     235 Pine Street<br>                     San Francisco** |

_____

*This brief is amended solely to add footnote 31, which was inadvertently omitted from the brief
as filed on December 7, 2009, and to correctly designate the record reference on p. 18, line 16.

Case: 03-03264    Doc# 1942    Filed: 12/08/09    Entered: 12/08/09 14:17:11    Page 1 of
38

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION .................................................................................................... 1

II.  STATEMENT OF RELEVANT FACTS and PROCEDURAL BACKGROUND ........... 4

     A.   The Intentional Torts and Bad Faith Prompting Kontrabecki's Assertion of His Fifth Amendment Right and Incarceration for Contempt .............................. 4

     B.   The Leigh Letter Left Open the Possibility of Prosecuting Kontrabecki If His Testimony Implicated Him In Bankruptcy Fraud ....................................... 7

     C.   Kukulka's Confidential Answers in the September Protocol Were Inadmissible Hearsay .................................................................................... 10

     D.   Lehman Did Not Mislead Kontrabecki About The September 2003 Protocol ............................................................................................................ 10

          1.   Other key findings against Kontrabecki in this Court's February 17 Decision ...................................................................................... 10

          2.   The 2003 Protocol was confidential under Polish law through June of 2005 and Kontrabecki has not shown that Lehman knew confidentiality was lifted until long after Kontrabecki's release. ............. 12

          3.   The 2003 Protocol was not produced because Polish law so required, not on the ground it was irrelevant ............................................ 14

          4.   Kontrabecki never made a specific request to have the 2003 Protocol viewed under seal or attempted to establish that Polish law would permit such review ...................................................................... 14

          5.   Kontrabecki filed his own criminal complaint against Kukulka and refused to disclose any related documents to Lehman on both the ground that it was not calculated to lead to the discovery of relevant evidence and that they were confidential .................................. 15

          6.   Kontrabecki and his lawyers have never filed any declarations that they were misled about the nature of the Protocol and its content ........... 16

          7.   Evidence of Kontrabecki's Independent Knowledge of the 2003 Protocol ........................................................................................... 17

     E.   Kontrabecki Offered Kukulka's April 2004 Protocol Into Evidence With Knowledge That Lehman's Counsel Covered the Same Territory in the September 2003 Protocol ............................................................................... 19

     F.   Kontrabecki Has Offered No New Evidence to Justify Reconsideration of this Court's Findings Exonerating Lehman on the Protocol Issues ..................... 20

     G.   The Issue of Control Has No Bearing on Lehman's Lost Opportunity Damages Claim ........................................................................................... 20

     H.   Kontrabecki Can Claim No Prejudice From Any Delay in Receiving the 2003 Protocol After Its Confidentiality was Lifted ......................................... 20

     I.   In Seeking Terminating Sanctions, Kontrabecki Improperly Relies on Void Findings, Presents No Supporting Evidence, and Offers No New Facts to Justify Reconsideration of the February 17 Decision ....................................... 21

III. ARGUMENT ....................................................................................................... 22

**TABLE OF CONTENTS**
(continued)

Page

A.    No Egregious Conduct by Lehman Has Been Established to Warrant Any Sanctions. ................................................................................................................... 23

B.    Terminating Sanctions Are A Drastic Remedy Of Last Resort And Inapplicable Here ........................................................................................................... 24

C.    The American Judicial System Strongly Favors Decisions on the Merits, But Also Recognizes Privileges from Discovery and Evidence ........................... 29

IV.    CONCLUSION ............................................................................................................... 30

Case: 03-03264    Doc# 1942    Filed: 12/08/09    Entered: 12/08/09 14:17:11    Page 3 of
38

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abraham v. County of Greenville,*
   237 F.3d 386 (4th Cir. 2001)................................................................. 28

*Anheuser-Busch, Inc. v. Natural Beverage Distrib.,*
   69 F.3d 337 (9th Cir. 1995).......................................................... passim

*Baxter v. Palmigiano,*
   425 U.S. 308 (1976)..................................................................... 29

*Cedar-Sinai Medical Center v. Superior Court*
   18 Cal.4th 1, 11-12 (1998)................................................................ 8

*Chevron Corp. v. Pennzoil Co.,*
   974 F.2d 1156 (9th Cir. 1992)........................................................ 30

*Conroy v. State Bar,*
   53 Cal. 3d 495. (1991) ................................................................. 23

*Edwards v. Marin Park, Inc.,*
   356 F.3d 1058 (9th Cir. 2004)........................................................ 25

*Fjelstad v. American Honda Motor Co.,*
   762 F.2d 1334 (9th Cir. 1985)................................................... 25, 26

*Halaco Eng'g Co. v. Costle,*
   843 F.2d 376 (9th Cir. 1988)............................................ 24, 25, 26, 27

*Hearn v. Rhay,*
   68 F.R.D. 574 (E.D. Wash. 1975) ................................................... 30

*Henry v. Gill Indus., Inc.,*
   983 F. 2d 943 (9th Cir. 1993)........................................................ 25

*Home Indem. Co. v. Lane Powell Moss, and Miller,*
   43 F.3d 1322 (9th Cir. 1995)......................................................... 30

*In the Matter of Farrell,*
   1 Cal .State Bar Ct. Rptr. 490 (Review Dept. 1991)........................... 23

*In the Matter of Harney*
   3 Cal. State Bar Ct. Rptr. 266 (Review Dept. 1995).......................... 23

*In the Matter of Respondent K,*
  2 Cal. State Bar Ct. Rptr. 335 (Review Dept. 1993)....................................................... 23

*In re Complex Asbestos Litig.,*
  232 Cal. App. 3d 572 (1991)............................................................................................. 8

*In re Napster,*
  462 F. Supp. 2d 1060 (N.D. Cal. 2006) ..................................................................... 26, 28

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,*
  456 U.S. 694 (1982)......................................................................................................... 26

*Kaiser Found. Health Plan, Inc., v. Abbott Labs., Inc.,*
  552 F.3d 1033 (9th Cir. 2009).......................................................................................... 30

*Link v. Wabash R.R. Co.*
  370 U.S. 626 (1962)......................................................................................................... 28

*New Alberton's Inc. v. Superior Court*
  168 Cal. App. 4th 1403 (2008) .......................................................................................... 7

*Moriarty v. State Bar*
  4 Cal. State Bar Ct. Rptr. 9 (Review Dept. 1999) ........................................................... 23

*Ohio v. Roberts,*
  448 U.S. 56 (1980), *overruled in part on other grounds by Crawford v. Washington,*
  541 U.S. 36 (2004)........................................................................................................... 12

*Phoceene Sous-Marine, S.A. v. U. S. Phosmarine, Inc.,*
  682 F.2d 802 (9th Cir.1982)....................................................................................... 25, 26

*Pioneer Inv. Servs. Co. v. Brunswick Assocs.* L.P.,
  507 U.S. 380 (1993)......................................................................................................... 28

*Roadway Express, Inc. v. Piper,*
  447 U.S. 752 (1980)......................................................................................................... 28

*Schilling v. Walworth Co. Park & Planning Comm'n,*
  805 F.2d 272 (7th Cir. 1986)...................................................................................... 28, 29

*School Dist. No. 13 Multnomah County Oregon v. ACandS, Inc.,*
  5 F.3d 1255 (9th Cir. 1993)............................................................................................. 28

*Societe Internationale pour Participations Industrielles et Commerciales, S.A. v Rogers*
  357 U.S. 197, 2 L Ed. 2d 1255, 78 S. Ct. 1087 (1958) .................................................. 25

Case: 03-03264   Doc# 1942   Filed: 12/08/09   Entered: 12/08/09 14:17:11   Page 5 of 38

# TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Amlani,*
169 F.3d 1189 (9th Cir. 1999) ................................................................. 30

*United States v. Bilzerian,*
926 F.2d 1285 (2d Cir. 1991) ................................................................. 30

*United States v. Hagege,*
437 F.3d 943 (9th Cir. 2006) ................................................................. 5

*United States v. James,*
915 F. Supp. 1092 (S.D. Cal. 1995) ....................................................... 28

*United States v. Nat'l Med. Enters, Inc.,*
792 F.2d 906 (9th Cir. 1986) ........................................................... 25, 26

*Wanderer v. Johnston,*
910 F.2d 652 (9th Cir. 1990) ................................................................. 25

*Wyle v. R.J. Reynolds Indus., Inc.,*
709 F.2d 585 (9th Cir. 1983) ........................................................... 25, 26

## STATUTES

18 U.S.C. § 3057(a) ................................................................................. 21

18 U.S.C. § 3283(a) ................................................................................. 5

## RULES

Cal. Evid. Code §413 ............................................................................. 8

Cal. R. Prof. Conduct 5-200 ....................................................... 13, 22, 23

Cal. R. Prof. Conduct 5-200 (D) ......................................................... 22

Cal. R. Prof. Conduct 5-220 ............................................................. 7, 13

Cal. R. Prof. Conduct 6068 (b) ........................................................... 23

Cal. R. Prof. Conduct 6068 (d) ..................................................... 13, 23

Cal. R. Prof. Conduct 6106 ................................................................. 23

Fed. R. Civ. Proc. 37 ........................................................................... 25

Fed. R. Civ. Proc. 37(b) ..................................................................... 25

Case: 03-03264   Doc# 1942   Filed: 12/08/09   Entered: 12/08/09 14:17:11   Page 6 of
38

Fed. R. Civ. Proc. 37(d) .............................................................................................. 25

Fed. R. Civ. Proc. 41(b) .......................................................................................... 24, 25

**OTHER AUTHORITIES**

U.S. Const. Amend. V.......................................................................................... passim

Vapnek, Paul W., Mark L. Tuft, Ellen R. Peck & Justice Howard B. Wiener (Ret.),
 CALIFORNIA PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY at § 8:232 (2008) ........... 8, 23

Case: 03-03264    Doc# 1942    Filed: 12/08/09    Entered: 12/08/09 14:17:11    Page 7 of
38

# I.    **INTRODUCTION**

For the reasons stated below, Plaintiff Lehman Brothers Holding Inc. ("Lehman") respectfully requests that the Court deny the pending motion[1] of Defendant John Kontrabecki ("Kontrabecki") for terminating sanctions against plaintiffs.  It constitutes a last minute Hail Mary attempt to prevent Lehman from obtaining a trial on the merits of its damage claims for the willful stay violation and three intentional torts this Court has already found as a matter of law that Kontrabecki committed back in January of 2003. (See August 28, 2009 Memorandum Decision on Partial Summary Judgment, attached to the Request for Judicial Notice in Support of Lehman's Opposition ("RJN") at Exhibit A; September 1, 2009 Second Memorandum Decision on Partial Summary Judgment (RJN Ex. B).  Contrary to the nefarious intent Kontrabecki attributes to Lehman and the Trustee, Aron Oliner, plaintiffs have pursued this action for one reason only – to be made whole from Kontrabecki's wrongful conduct in knowing violation of its rights and this Court's and the Trustee's authority.

The pending motion is largely a rehash of two prior attacks on Lehman which the Court rejected.[2]  Out of all the discovery provided over the past several years, Kontrabecki claims that Lehman's counsel deliberately concealed and suppressed two "critical" documents:  a September 2, 2003 confidential witness statement of Piotr Kukulka ("2003 Protocol") in a preliminary criminal investigation in Poland – which this Court found to constitute inadmissible hearsay and largely duplicative of Kukulka's disbelieved testimony in April of 2004 – and a copy

---

[1] By the tentative ruling in its docket order of November 22, 2009, to which the parties have agreed, this Court postponed consideration of Lehman's Motion for Reconsideration of Partial Summary Judgment Re Lost Opportunity Delay Damages until disposition of the instant motion, and postponed until the resolution of the damages proceeding consideration of Kontrabecki's (1) Motion to Strike and/or Vacate the Court's Contempt Rulings and (2) Motion to Reconsider the Court's Contempt Rulings, as well as Kontrabecki's Motion for the Issuance of Monetary Sanctions Against Plaintiffs' Counsel Peter Benvenutti, The Law Firm of Jones Day, Mark Kaufman, The Law Firm of McKenna Long & Aldridge, LLP and Aron M. Oliner.

[2] With the exception of a few new sentences, Part II C through G of  Defendant John Kontrabecki's Memorandum of Points and Authorities in Support of His (1) Motion for Sanctions Against Plaintiffs Terminating the Adversary Proceedings ("Kontrabecki Sanctions Memo" (pp. 10-26) were cut and pasted virtually verbatim from Kontrabecki's June 4, 2008 Memorandum of Points and Authorities in Support of his Sanctions Motion Against Lehman (RJN Ex. C); and Kontrabecki completely disregards the Court's subsequent findings of fact *against* Kontrabecki on many of these same issues in February and September of this year.

of an August 4, 2003 letter from Assistant United States Attorney ("AUSA") Lawrence Leigh to the Trustee ("Leigh Letter") stating that the government had not yet solved "the problem of the dedication of investigative resources to [the criminal] case" against Kontrabecki. *See* Nov. 17, 2009 Declaration of Michael J. Betz Declaration ("Betz Dec."), Ex A.

In seeking terminating sanctions against Lehman for its attorneys' alleged shortcomings, Kontrabecki misperceives governing law and totally ignores the impact of this Court's Amended Memorandum Decision on Motion for Sanctions entered February 17, 2009 ("Feb. 17 Dec." or "Feb. 17 Decision") and the September 3, 2009 Memorandum Decision On Motion To Strike and For Preclusion Order ("Sept. 3 Dec." or "Sept. 3 Decision") (RJN Exs. D and E, respectively). In these two decisions – neither of which was the subject of a motion by Kontrabecki for reconsideration – the Court expressly found no causal relationship between this Court's order incarcerating Kontrabecki for contempt and the belated allegations of misconduct by Lehman's counsel. The 2003 Protocol never even became the subject of any motion to compel, despite this Court's requirement in the fall of 2003 that Lehman brief the applicable Polish law to permit Kontrabecki, if he chose, to challenge Lehman's position that Polish law prohibited disclosure of the Protocol. Nor did Kontrabecki ever ask Lehman's counsel or the Trustee for an update on the status of the American criminal proceeding, let alone promulgate *any* discovery directly targeted at communications with the U.S. prosecutor as he did in October of 2003 to seek the confidential 2003 Protocol. The Leigh Letter did not relieve Kontrabecki of any criminal exposure, nor, as he himself admitted last spring, was it critical to his decision-making in July 2004 when he faced imminent incarceration. As the Court found just three months ago, Kontrabecki was prepared to fully waive his Fifth Amendment rights in late July 2004, irrespective of the status of the criminal proceeding (Sept. 3 Dec. at p. 4; RJN Ex. E).

Neither document that Kontrabecki now claims is crucial to his defense has any bearing on his ability to defend himself in the prospective damages trial which the sanctions motion seeks to prevent. This whole exercise is a red herring. Kontrabecki ignores findings that Lehman was not at fault for the conduct of its counsel of which he complains. He misstates other law of the case, misrepresents alleged precedent for the relief sought, rewrites the record and *fails to provide*

*any evidentiary support* for serious allegations against Lehman's counsel and the Trustee of "intentional," "wanton," "vexatious" and "egregious" misconduct justifying termination, when this Court has made no finding of misconduct by Lehman or any intentional discovery violations by its counsel or the Trustee.[3] Indeed, without providing *any* basis for the Court to reconsider its prior conclusions, Kontrabecki's Motion flies in the face of the Court's finding that the conduct of Lehman's counsel regarding the Protocol "does not even remotely approach bad faith or willful misconduct. *It was **not** egregious.*" (Feb. 17 Dec. at 26:17-20; RJN Ex. D; emphasis added.)

Even taken together and with the additional spin Kontrabecki seeks to put on them, the two claimed discovery violations over seven years of litigation do not constitute the extreme circumstances of flagrant discovery abuse, destruction of evidence, or criminal conduct that have been held on rare occasion to justify terminating sanctions. Unlike *Anheuser-Busch, Inc. v. Natural Beverage Distrib.*, 69 F.3d 337, 348 (9th Cir. 1995) – which Kontrabecki incorrectly cites as his principal authority for the draconian relief sought here – this case does not involve a history of rampant stonewalling of discovery and violation of Court orders by the party against which sanctions are sought; this Court has instead found *no misconduct at all by Lehman*. Most tellingly, as discussed in Part III below, Kontrabecki fails to demonstrate any cognizable nexus between the conduct complained of and Lehman's damage claim. Instead he makes the remarkable assertion that he "continues to believe to this date" that "he had done nothing wrong in connection with the recapitalization" (Kontrabecki Sanctions Memo. 6:19-20), reflecting an extraordinarily stubborn refusal to take any responsibility for his own repeated intentional misconduct.[4] No reason has been offered for this Court to impose *any* sanction upon Lehman, let alone the ultimate sanction of dismissal of a damage claim brought by an innocent victim seeking

---

[3] Kontrabecki chose to submit scant evidence to support any part of his Motion. Lehman's opposition relies solely on evidence already in the record, with the possible exception of several emails from Kontrabecki's counsel, and brief excerpts from Kontrabecki's deposition and response to Lehman's document request. Lehman believes the evidentiary record on this Motion should therefore be considered closed, and the Court should not permit Kontrabecki to inject new evidence in the reply or at the hearing.

[4] Kontrabecki's view of the case appears to be that, through absolutely no fault of his own, he has been snared in a Kafkaesque trap laid through the evil machinations of Lehman, its counsel and the Trustee, to which the Court has been an unwitting accomplice.

redress from an intentional tortfeasor.

## II. STATEMENT OF RELEVANT FACTS AND PROCEDURAL BACKGROUND

We take up in turn each of Kontrabecki's assertions in the same order as set forth in his brief – focusing on key facts he has left out or misrepresented.

### A. The Intentional Torts and Bad Faith Prompting Kontrabecki's Assertion of His Fifth Amendment Right and Incarceration for Contempt

When finally deposed in 2009, Kontrabecki admitted he purposely did not inform this Court about his intent to dilute TKG's 100 percent ownership by the so-called "recapitalization" because he did not expect the Court was "going to provide any relief." (April 9, 2009 Kontrabecki Deposition Transcript at 172:13 – 174:10, Exhibit 1 to the Declaration of David Gordon in Support of Lehman's Opposition.). In a recent declaration, Kontrabecki noted that TKG and CEIDCO's former lawyer Paul Riehle – who had no bankruptcy expertise – warned him repeatedly in January of 2003 in telephone conversations "both before and after the recapitalizations were concluded" against that action as a "poor litigation strategy" that Lehman would use to "diminish" Kontrabecki's credibility in court and "undermine CEIDCO's litigation position against Lehman." (Jan. 29, 2009 Declaration of John Kontrabecki ("Jan. 29 Kontrabecki Dec."); RJN Ex. F) at 6:16-20). Kontrabecki responded "Yes we violate the Lehman Loan Agreement," and he answered Riehle's concerns of how such conduct might look to the Court with his assessment that "it was worth taking this risk." (*Id*. at 6:20-21, 26-27). In his current motion, Kontrabecki claims he invoked the Fifth Amendment rather than testify about the Share Dilutions because he "believed Lehman's attorney [sic] were trying to trap him into making statements under oath that they would then try to use to have him charged with committing crimes." (Kontrabecki Memo p. 10:3-5). In reality, if Kontrabecki had answered questions under oath in 2003 admitting his intentional torts and violation of this Court's orders, it could have shortened these proceedings by six years. That outcome – which is all that Lehman sought – would have eliminated any need for Lehman to pursue its lost opportunity damages case.

Kontrabecki had the right to invoke the Fifth Amendment to avoid the risk of incriminating himself. Given this Court's findings that Kontrabecki willfully violated the

automatic stay and committed three intentional torts in January of 2003, his concerns were obvious: he feared admission of bankruptcy fraud or perjury charges and wanted to make it as difficult as possible for Lehman to prove his violation of the February 2003 Unwind Injunction. By invoking the Fifth Amendment, offering to partially waive it (because he unilaterally decided his actions prior to May 25, 2004 were irrelevant (March 17, 2009 Kontrabecki Declaration ("March 17 Kontrabecki Decl.") at 1:18-23; RJN Ex. G), and then deciding to fully waive it without communicating that decision to the Court, he chose to go to jail for over eleven months for contempt rather than explain his conduct under oath as the Court invited him to do on multiple occasions.  In the current motion, he repeatedly states that he invoked the Fifth Amendment on advice of counsel.  Kontrabecki Sanctions Memo pp 5:3-4, 26-28, 6:9.  Lehman's criminal defense expert has opined that under circumstances where the client risked millions of dollars in fines and incarceration for contempt "I would pay particularly close attention to whether doing so was necessary.  I would not advise a client to face such consequences of invoking the Fifth Amendment unless I had very grave concerns that answering questions would lead to prosecution *and* conviction."  May 15, 2009 Cristina C. Arguedas Declaration ("Arguedas Dec."), RJN Ex. H. Now that the five-year statute of limitations has run on bankruptcy fraud relating to the Share Dilutions[5] and Lehman was put to extraordinary expense and lengthy delay to reverse them through circumstantial evidence, Kontrabecki claims that he would have waived his Fifth Amendment rights in 2003 if only he had known about the Leigh Letter.  This self-serving conjecture, wholly at odds with his own testimony, unsupported by any declaration or other testimony from the lawyers on whose advice he says he relied, and contradicted by compelling expert opinion and common sense, provides absolutely no basis for his invitation to this Court to impose terminating sanctions on Lehman – which has done nothing to warrant any sanctions whatsoever.

In asserting advice of counsel, Kontrabecki has not said what he told Farella, Braun & Martell to solicit that original advice.  We do have the declaration of Farella's William Keane that

---

[5] The deadline for bringing any such criminal prosecution was January of 2008. (*See United States v. Hagege,* 437 F.3d 943, 946 (9th Cir. 2006); 18 U.S.C. § 3283(a)).

he advised Kontrabecki to invoke his Fifth Amendment rights in early 2003 because of the anticipated criminal referral. April 21, 2009 Keane Declaration at 2:16-17; RJN Ex. I. His partner Dean Gloster then wrote to the U.S. Trustee a four-page letter in May 2003 "setting the record straight" with assertions of Kontrabecki's version of the operative events. Kontrabecki Sanctions Memo p. 28: 25-26, fn. 4. Despite the dire consequences his client faced in July 2004, Keane stated he did not contact the AUSA for an update because he did not want to "risk drawing…attention" to his client. *Id.* at 2:16. Keane's apparent assumption that the criminal case was dormant more than a year after his partner's letter to the U.S. Trustee[6] belies Kontrabecki's repeated assertion that he feared "imminent criminal prosecution" in the summer of 2004. Kontrabecki Sanctions Memo at 5:7, 25, 6:24. Kontrabecki has not provided this Court with any declaration as to what information and research the Farella firm relied upon to advise Kontrabecki to continue to invoke the Fifth Amendment after having "set the record straight" in May of 2003. An obvious inference is that the Farella firm did not expect the AUSA to conclude no crime had been committed in its independent analysis of the facts they had offered in opposition to the Trustee's referral. Indeed, if Kontrabecki had testified in 2003 or 2004 as he did in 2009, his attorneys would have had good reason to fear his prosecution and conviction for bankruptcy fraud, especially in view of the AUSA's request to be kept informed "of any additional significant developments." The prospect of Kontrabecki admitting on the record under oath to his pivotal personal role and intentions in engineering the Share Dilutions, and that such testimony might have been seen as an "additional significant development" and "drawn the attention" of the AUSA to take a fresh look at possible prosecution, would likely have weighed very heavily, and probably conclusively, against advising a waiver of the Fifth Amendment in reliance on the Leigh Letter.[7]

       Most significantly – indeed fatally – Kontrabecki also claims that this Court "has

---

[6] To blame Lehman for not producing a copy of the Leigh Letter, Kontrabecki's lawyers ask the Court to assume that after writing a long and pointed letter challenging the Trustee's criminal referral in May of 2003, even a simple follow-up telephone call supposedly never happened during the next two years. We have no declaration from Kontrabecki or any of his counsel other than Keane addressing whether they took any action or obtained any information regarding the status of the Trustee's referral.

[7] See discussion in part II.B of the text and at fn. 11, *infra*.

Case: 03-03264   Doc# 1942   Filed: 12/08/09   Entered: 12/08/09 14:17:11   Page 13 of 38

apparently" misinterpreted his declaration as to his state of mind in July of 2004, but does not

quote the language in question or submit any new declaration explaining it (Kontrabecki

Sanctions Memo at 9:25).  His March 2009 declaration states in pertinent part: "***When it became***

***apparent to me that the Court would not permit me to testify*** [at the July 23, 2004 hearing]***, I***

***was prepared to completely waive my Fifth Amendment rights and provide testimony for events***

***occurring prior to May 25, 2004.***"  March 17 Kontrabecki Dec. at 2:7-9 (emphasis supplied);

RJN Ex. G.  Kontrabecki submitted an additional declaration in April in which he stated:

"Indeed, as I stated in my March 17 Declaration, when it became apparent at the July 23, 2004

hearing on my motion to dissolve the February 2003 injunction that the Court would not let me

testify based on a *partial* Fifth Amendment waiver, I resolved, even without knowing about the

August 4, 2003 letter, to do a complete waiver so that I could testify."  April 21, 2009

Kontrabecki Dec. at 3:7-11; RJN Ex. J.  Given these clear and unequivocal statements of

Kontrabecki's intent, the Court is left with an unbridgeable missing link in Kontrabecki's Fifth

Amendment causation chain, the same link that the Court found missing in its Sept. 3 Decision.

## B.     The Leigh Letter Left Open the Possibility of Prosecuting Kontrabecki If His Testimony Implicated Him In Bankruptcy Fraud.

Part II.B of Kontrabecki's brief need not be considered in light of his failure to provide

facts in Part II.A justifying reconsideration of the September 3 finding that Kontrabecki was

prepared to waive his Fifth Amendment rights irrespective of the status of the criminal

proceeding.  But it is also deficient and misleading in many respects.  In an effort to create an

aura of intentional misconduct where none has been found (and none exists), Kontrabecki

misstates that this Court found that Lehman "suppressed" the Leigh letter (Kontrabecki Memo re

Terminating Sanctions at 9:6).  Suppression is the term used in California Rule of Professional

Conduct 5-220 to address intentional concealment of a document the lawyer had a known duty to

produce.  *cf* Cal. Evid. Code §413 and Judicial Council of California Civil Jury Instruction 204

regarding inferences drawn from wilful suppression of evidence.  *New Alberton's Inc. v. Superior*

*Court*, 168 Cal. App. 4th 1403, 1434 (2008) (instruction appropriate only if there is evidence of

"wilful suppression, that is, evidence that a party destroyed evidence with the intention of

preventing its use in litigation"); *Cedar-Sinai Medical Center v. Superior Court,* 18 Cal.4th 1, 11-12 (1998) (in ruling there does not exist a separate tort cause of action for intentional spoliation of evidence, court observed there exist effective nontort remedies that seek to punish and deter the intentional spoliation or suppression of evidence, including an unfavorable evidentiary inference against a party under Cal. Evid. Code §413 and disciplinary action against an attorney for violation of Rules Prof. Conduct, Rule 5-220. The Sept. 3 Decision merely stated that, "The court agrees with Kontrabecki that the AUSA's letter should have been produced in response to his discovery request." (*Id.* fn. 5 p.3).

Absent a pending request, no duty to produce the Leigh Letter existed.[8]  The Court did not say who should have produced the letter – Lehman or the Trustee or both – or what discovery request it related to and what put them on notice that it was subject to discovery.[9]  The Court stated that it did not read and evaluate the expert opinions offered on that subject.  Sept. 3 Dec., p. 3 fn. 5; RJN Ex. E.  In a clarifying memorandum issued on October 26, 2009, this Court indicated that footnote 5 was unnecessary to its September 3 Decision and could be litigated again in another proceeding.[10]

---

[8] It is a settled rule in California that "attorneys owe no duty of care to adversaries in litigation or to those with whom their clients deal at arm's length."  *In re Complex Asbestos Litig.*, 232 Cal. App. 3d 572, 588 (1991) Kontrabecki's own expert Paul Vapnek, in his treatise on professional responsibility states: "In civil cases, lawyers must not 'suppress' evidence which their clients have an obligation to disclose.  However, except as noted below, they are under **no obligation to volunteer** evidence harmful to their client's position. Thus, there is no obligation to produce records containing harmful information in the absence of an appropriate discovery request before trial, or absent a subpoena or notice to produce at trial."  Vapnek, Paul W., Mark L. Tuft, Ellen R. Peck & Justice Howard B. Wiener (Ret.), CALIFORNIA PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY at § 8:232 (2008) (emphasis in original) (hereafter cited as "Vapnek Treatise.").

[9] Kontrabecki's April 16, 2003 subpoena sought documents concerning the "the proposed, contemplated, or effected transfer or issuance of membership interests in WDC or OBC" (but with no reference whatsoever to U.S. criminal proceedings or U.S. authorities) "created or transmitted between January 17, 2003 and the present."  Exhibit E to Declaration of Tyler Gerking in Support of Kontrabecki's Memorandum of Points and Authorities Regarding Plaintiff's Failure to Disclose Information Relevant to His Assertion of the Fifth Amendment Privilege, filed April 21, 2009 [Docket No. 1746], RJN Ex. K.  By its own terms, even if the reference to "membership interest in WDC or OBC" should have been read to include a letter like the Leigh Letter (which did not mention them at all, or for that matter *any* aspects of the Share Dilution Transactions), the subpoena excluded both the criminal referral **and** the Leigh Letter, which were created and transmitted after April 16, 2003.  Kontrabecki's own expert Paul Vapnek did not opine that the April 16, 2003 subpoena could be read as calling for production of the Leigh Letter.

[10] The Court stated in pertinent part "the effect of the non-disclosure of the letter was 'fully dissipated.' In other words, I saw no need to consider the fact that the letter had not been produced previously as particularly relevant to the issues presented by the Motion to Strike. For my purposes

There has been no finding of suppression, and no grounds exist here for such a finding. Yet, without offering any factual basis, Kontrabecki states that his "assertion of his Fifth Amendment privilege was the direct result of deception, suppression of material information, and misconduct perpetrated by Lehman and the Trustee and their counsel." Kontrabecki Sanctions Memo, 10:11-13. Kontrabecki persists in referring – inaccurately – to the Leigh Letter as a "no prosecution" letter[11] (Kontrabecki Sanctions Memo, at 7:10 and claims that within days any prospects of prosecution "were extinguished." *Id.* at 8:23. Yet he elsewhere acknowledges that he was not "home free" in August of 2003. *Id.* at 8:28. Indeed, as Arguedas opined, the Leigh Letter indicates continuing interest in Kontrabecki by asking to be informed "of any additional significant developments in your case." She would not have relied upon that letter to advise a client in Kontrabecki's position to waive his Fifth Amendment rights if there were valid reasons for invoking them in the first place. Arguedas Decl., ¶ 7; RJN Ex. H.[12] Kontrabecki also omits

---

(continued…)

the facts that came to light (see 5:2-19) made the non-production of the letter a nonissue. Based on my perception of what remained to be decided (see 5:24-25), I added footnote 6 to inform the parties that I would not decide or opine about unfiled motions and claims that I saw no need to – and did not – make any determinations about the opposing experts' views or whether Mr. Kontrabecki should or could have learned about the AUSA's letter on his own. Resolution of the issue of whether or not the AUSA's letter should have been produced in August, 2003, was "not necessary" to a decision on the Motion to Strike." Memorandum Decision Oct. 26, 2009, RJN, Ex. L. Lehman and its counsel – and presumably the Trustee – intend to challenge the existence of any such discovery obligation if and when it becomes necessary to address that question. Since Kontrabecki relied on the advice of his own counsel in invoking the Fifth Amendment in the spring of 2003 and continued to rely on the advice of counsel thereafter, at a minimum, he cannot claim that it was the *direct result* of Lehman's nondisclosure that he made any decisions about invoking or waiving the Fifth Amendment. This Court has no way of knowing what factors were considered, or how heavily in retrospect the Leigh Letter would have weighed in the advice Kontrabecki's lawyers gave him, if at all. Perhaps they discussed at the time the probability the case was dormant and unlikely to be prosecuted *unless* he was foolish enough to waive his rights, testify truthfully and hand the AUSA a bankruptcy fraud prosecution on a silver platter. If so, seeing the Leigh Letter would have made no difference in their analysis, just as Lehman's expert, Ms. Arguedas, opined. Arguedas Dec. ¶7, RJN Ex. H.

[11] Arguedas Decl., ¶ 7 ("The [Leigh Letter] does not state or suggest in any way that the United States Attorney's Office has determined not to prosecute Mr. Kontrabecki, or has made any determination whether he has committed a crime.")

[12] Consider – as Kontrabecki and his lawyers must have done – the consequences of a decision in 2003 to waive the Fifth Amendment. Kontrabecki would have been subjected to extensive, detailed questioning about both the circumstances of the Share Dilutions and his conduct (and inaction) relating to the Unwind. Truthful answers would have created an extensive record of admissions demonstrating the intentional conduct constituting bankruptcy crimes – insulated from culpability only by Kontrabecki's incredible explanation of innocent intent, which may have changed the

mention of the lengthy Kaufman letter to the Chief of the Criminal Enforcement Unit of the U.S. Trustee Program in March of 2005 which evidences Lehman's counsel's then current belief that prosecution could still occur. Exhibit B to Kaufman Declaration filed May 15, 2009 [Docket No. 1772]; RJN Ex. M.

Kontrabecki repeatedly claims that his decision not to testify was made in reliance on the advice of his own prior counsel. He provides no evidentiary basis for this Court to find that either he or his counsel believed that criminal prosecution was imminent in the summer of 2004. Indeed, Keane's declaration appears to assume that it was dormant. April 21, 2009 Keane Dec.; RJN Ex. I. Nor does Kontrabecki explain why he or his counsel were excused from simply asking either Lehman's counsel or the Trustee for an update on the status of the criminal prosecution at any time after the Trustee made his referral in the Spring of 2003, through the eleven-plus months that Kontrabecki spent in jail for contempt[13] – which Arguedas opines would be the obvious thing to do under the circumstances. Arguedas Dec. ¶5, RJN Ex. H. Kontrabecki has not disclosed what other factors he and his counsel *did* consider in choosing the strategy they followed. This is another gaping hole in causation.

### C. Kukulka's Confidential Answers in the September Protocol Were Inadmissible Hearsay

This Court has found that Kukulka's statements in the 2003 Protocol were inadmissible

---

(continued…)

AUSA's calculus of the resources needed to move forward with the prosecution. Kontrabecki's testimony regarding the Unwind would have given Lehman access to the *only witness* possessing personal knowledge of Kontrabecki's Unwind efforts – Kontrabecki himself – who was subject to this Court's jurisdiction and discovery process, and would have permitted Lehman to expose his recalcitrance and contempt of the Unwind Injunction by demonstrating both his actions in direct contravention of the injunction mandates – à la his machinations with G.E. Capital and RZB – and the feebleness of his efforts, if any, to direct or persuade Kukulka to put his signature on the documents required to reverse the Share Dilutions. And testimony could have exposed Kontrabecki to charges of perjury as well. Instead, by invoking the Fifth Amendment, Kontrabecki not only insulated himself from risk of self-incrimination and perjury, he achieved a substantial *tactical advantag*e in resisting contempt by forcing Lehman to prove his contempt through circumstantial evidence.

[13] The carelessness and cavalier attitude with which Kontrabecki exaggerates and misstates facts in his brief is illustrated by his repeated misstatements of the time he spent in jail as fourteen months. The actual time he spent in jail to coerce him to comply with the Unwind Injunction and contempt order is readily ascertainable, and amounts to 343 days, or a little more than 11 months. RJN Exs. Y1-Y21; Benvenutti Decl., ¶8 and Ex. 4.

hearsay and, even when provisionally considered, were duplicative of his April 2004 testimony and not credible. Feb. 17 Dec., p. 26  The Court has also ruled the issue of control irrelevant to the damages trial (October 11, 2007 Mem. Dec. at 3:26-4:11; RJN Ex. N.  The questions and answers at 11:10 through 13:8 of Kontrabecki's Sanctions Memo violate that ruling, remain inadmissible hearsay, and, because Kontrabecki has not even attempted to justify reconsideration of the prior rulings, should be stricken.

**D.    Lehman Did Not Mislead Kontrabecki About The September 2003 Protocol**

      **1.    <u>Other key findings against Kontrabecki in this Court's February 17 Decision</u>**

In repeating almost verbatim his failed June 2008 Motion for Sanctions against Lehman Kontrabecki ignores other key findings of this Court in its February 17 Decision which undermine his motion.

> "Although Lehman asserted a 'relevance' argument orally at the [October 7, 2003] hearing, in its written opposition [to production of the 2003 Protocol] offered to the Court the following day Lehman did not repeat its relevance objection." 5:23-25, fn.3. *See* II.D.3 below.

> "Kontrabecki has not shown that any of Lehman's United States or Polish counsel knew at any time before the end of Kontrabecki's incarceration that confidentiality had terminated." 6:21-24. *See* II.D.2 below.

> "Lehman's September 24, 2003 disclosure [in the Polish bankruptcy proceeding of a small amount of irrelevant financial information revealed by Kukulka in the 2003 Protocol] did not terminate the Protocol's confidential nature." 14:12-18. [14]

> "Kontrabecki has not shown that Lehman knew of [the commencement of the prosecution phase against Kukulka of criminal] proceedings prior to the time Kontrabecki's incarceration ended. Any failure to produce the Protocol after the end of the incarceration . . .is harmless." 14:25-28,15:1. *See* II.D.2 and II.H. below.

> The Protocol was "inadmissible hearsay" [in 2003-2004]. 26:3[15] *See* II.D. 2 below.

---

[14] This issue arose after Lehman produced discovery in June of 2007 that included a brief in the Polish bankruptcy proceeding. Kontrabecki has not provided any basis for reconsideration of the Court's finding of no waiver of confidentiality based on the Polish bankruptcy disclosure, rejecting the thrust of the contrary opinion of Kontrabecki's expert Dr. Swiatlowski. Feb. 17 Dec. 14:11-18.  Kontrabecki also never offered *any* evidence that Lehman's American counsel had any knowledge of that limited disclosure in Poland prior to June 2007, and Lehman's U.S. counsel had no such knowledge. *See* Kaufman Declaration in opposition to motion for sanctions, filed Aug. 2, 2008, at 2:1-14 [Docket No. 1622] (RJN Ex. P); Benvenutti Declaration in opposition to motion for sanctions, filed Aug. 2, 2008, at 6:3-14 [Docket No. 1623] (RJN Ex. Q); Corrected Declaration of Lech Gilicinski in opposition to motion for sanctions, filed Aug. 2, 2008 at 4:27-5:9 [Docket No. 1628] (RJN Ex. R).

[15] At 23:24-28 of his Sanctions Memo, Kontrabecki purports to quote from Mr. Kaufman's statements made at the September 16, 2003 hearing.  His quote of Mr. Kaufman is identical to the one contained in his initial June 6, 2008 Motion seeking sanctions against Lehman relating to the Protocol, which

Kontrabecki has offered no new facts or legal basis for the Court to reconsider these findings.

**2. The 2003 Protocol was confidential under Polish law through June of 2005 and Kontrabecki has not shown that Lehman knew confidentiality was lifted until long after Kontrabecki's release.**

This Court properly concluded that the handwritten 2003 Protocol – a police officer's record of a confidential criminal investigative proceeding which included a number of questions from Lehman's Polish counsel and Kukulka's answers that the officer apparently did his best to take down verbatim[16] – was inadmissible hearsay and protected from disclosure in discovery

_____

(continued…)

this Court adopted verbatim in its February 17 Decision, not realizing that it had been altered by Kontrabecki's addition of bracketed verbiage to buttress his contention that Lehman had failed to reference the Protocol when its counsel allegedly argued that "there was no evidence out there" to support Kontrabecki's contention that "Kontrabecki does not control Kukulka".

A review of the September 16, 2003 Transcript shows that Mr. Kaufman, while addressing points contained in Lehman's closing argument five page demonstrative exhibit (*see* Benvenutti Dec. filed August 22, 2008, at 6:3-14 [Docket No. 1623] stated:

> . . . in our view and I think a review of the history of the case, the ***record before the Court***, that there was no other exonerative evidence ***ever offered by Mr. Kontrabecki*** that Mr. Kukulka was his own man. They can make ***those*** statements, but there is no real evidence out there to ***that*** effect.

Sept. 16, 2003 Trans. at 154:25-155:4 (RJN Ex. S); emphasis added.

Mr. Kaufman's point was that, contrary to "those" statements which Kontrabecki's counsel had made in argument to the Court, in fact the "record before the Court" did not reflect any exonerative evidence, nor had Kontrabecki "ever offered" exonerative evidence to "that effect." Kontrabecki's insidious insertion of the bracketed verbiage into Mr. Kaufman's statement put words in Mr. Kaufman's mouth that materially changed the import of the quoted passage. After the first clause of the last sentence of the quoted passage that read "They can make those statements . . .", Kontrabecki or his counsel added ". . . [that Mr. Kontrabecki does not control Kukulka] . . .". With that added clause, Kontrabecki claimed that Lehman's counsel had knowingly deceived the Court about the Protocol by arguing that "there is no real evidence out there . . . that Kontrabecki does not control Kukulka." Mr. Kaufman, of course, never made that assertion.

[16] The Protocol is not set forth in the form of an American transcript but looks more like a report. As Kontrabecki notes in his brief "It was not a word-for-word transcript." (Kontrabecki Sanctions Memo at 18:15-16.) In fact, in answering questions at a confidential Protocol the witness is unrepresented and the statements made are intended only for use in the police investigation. While statements are nominally given under penalty of perjury, there is no meaningful enforcement mechanism. Any admissions in the Protocol cannot even be used against the witness in an ensuing criminal trial Declaration of Bartlomiej Jankowski in opposition to motion for sanctions, filed August 1, 2008, at 8:2-6 [Docket No. 1615]; RJN Ex. T. The person taking the notes on September 2, 2003 was a police official who did not verify the accuracy of his notes. The only verification contained in the Protocol is as to the accuracy of the translation into English. Translated Protocol, RJN Ex. U. There is thus no one who has certified that the Protocol reflects exactly what the witness said or the questioners asked as there is in a U.S. deposition or court transcript, both of which provide the added safeguard of a process for correction of any perceived mistakes in the record. Moreover, Poland does not permit leading questions. Jankowski Decl., 7:14-15. Without the ability to ask leading questions – "the principal tool and hallmark of cross-examination" [*Ohio v. Roberts*, 448 U.S. 56, 70 (1980),

under Polish law from September of 2003 through the date Lehman became aware of the June 2005 commencement of the prosecution phase of criminal proceedings against Kukulka. Feb. 17 Dec.; RJN Ex. D. Lehman's counsel was therefore entitled – in fact required under threat of criminal penalties – to assert the confidentiality of the Protocol and to refuse to disclose its contents[17] from the fall of 2003 throughout the time Kontrabecki was incarcerated. The concern raised by this Court on the duty of candor issue was not that Lehman's counsel claimed the Protocol was not discoverable, but that Lehman's American counsel should have done more to alert Kontrabecki about its form and content than simply revealing that the document being withheld was a report or transcript of Kukulka's answers to questions based on Lehman's fraud complaint and that Lehman's Polish counsel were present when the interrogation occurred. The Court found that Lehman's American counsel should have affirmatively disclosed in response to the discovery request that Lehman's Polish counsel conducted "virtually the entire examination, that the Protocol reflected the questions asked and answers given, that Kukulka was under oath and faced criminal penalties for false testimony or concealing the truth, and that the Protocol had been translated into English." (*Id*., at 15:11-16). That Decision left open issues of alleged violation by Lehman's American counsel of State Bar Rules 5-200, 5-220 and 6068 (d), all of

---

(continued…)

*overruled in part on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004)] – and without document production by Kukulka in advance, it is much harder to catch the witness in a mistake or lie. Not only did Lehman not get documents in advance, it never got any documents from Kukulka at all.

There is no evidence in this record that the 2003 Protocol was "the best available alternative to a U.S. style deposition," as Kontrabecki claims in his brief. (*Id*., 19:23-24). The Protocol was not admissible in the Polish criminal proceeding or any other public proceeding and recites that Kukulka agreed to make himself available at a later date for ***deposition*** in that same proceeding. Translated Protocol, RJN Ex. N. Presumably, the reason for Kontrabecki's pursuit of a Hague Convention examination of Kukulka was because it was also a better available alternative (i.e. more like a U.S. deposition). After a lengthy, expensive wild goose chase, Kukulka refused to cooperate with that effort just as Kontrabecki's counsel anticipated he would do, claiming the Polish equivalent of the Fifth Amendment in refusing to testify publicly. (Nov. 20, 2008 e-mail from Tyler Gerking to Mark Kaufman, attached as Exhibit 1 to the Declaration of Peter Benvenutti ("Benvenutti Dec.") in Support of Lehman's Opposition).

[17] Far from being a "fall-back" argument, as Kontrabecki mischaracterizes it (Kontrabecki Sanctions Memo, at p. 15:18), the Polish criminal law confidentiality requirement was dispositive, consistently accepted by Kontrabecki as such *throughout the course of this case* (*see* II.D.5, *infra*), and correctly viewed by both Kontrabecki and the Court in October 2003 as *the* basis for Lehman's objection to its production – Lehman never asserted any other written objection to its discovery.

which require proof of specific intent.  (*See* Discussion in Parts II.I and  III.A. below.)  Whether any Rule violation resulted from such asserted shortcomings must await another day, but Lehman was found to have no responsibility for such alleged breach of the duty of candor by its counsel. Feb. 17 Dec. at 2:5-9.  Kontrabecki has provided no basis for the Court to reconsider that ruling.[18]

### 3.    The 2003 Protocol was not produced because Polish law so required, not on the ground it was irrelevant.

Kontrabecki also is wrong to claim that Lehman "vigorously resisted" producing the Protocol on the ground of relevance. (Kontrabecki Sanctions Memo, 14:16.)  As the Court noted, in Lehman's written response to that October 2, 2003 discovery request, Lehman made no such objection.  Feb. 17 Dec., fn. 3.  Indeed, even the quotes in Kontrabecki's brief from Lehman's counsel at oral argument in October of 2003 are taken completely out of context (Sanctions Memo, 14:19-28, 15:1-3).  The document request Benvenutti received on October 3, 2003 – four days before the hearing – covered a wide array of discovery, and Benvenutti's comments were not specifically directed to Request No. 2.  Everyone at that hearing knew that Kukulka had just been examined in September at a Polish police station for allegedly acting as Kontrabecki's pawn and conspiring with him to defraud Lehman through the recapitalization.  Benvenutti was obviously not characterizing the subject matter of the police report as of marginal relevance to Lehman's efforts to effectuate an Unwind of the Share Dilutions, and the Polish criminal law confidentiality restriction – not the form or content of the Protocol – was the primary and dispositive factor on whether production of the Protocol could or should be required.  And, as noted above, Lehman's written response to Request No. 2 raised no relevancy objection. Tellingly, Kontrabecki has never filed any declaration asserting that he or his attorneys were ever misled by Benvenutti into believing that the record of Kukulka's statements was irrelevant to the

_____

[18] Indeed, Kontrabecki would first need to establish a basis for this Court to find that Lehman's counsel had advance notice that they were expected to provide in Lehman's discovery response to the October 2 request the type of detail about the Protocol that the Court sought, and should have known that they could do so without violating the confidentiality of the Protocol.  In any event, the Court held that not providing such detail did ***not*** constitute bad faith.  Feb. 17 Dec. 26:17-20.  Given that Kontrabecki has been even less forthcoming in his discovery response on the exact same issue, it is hard to believe he genuinely agrees with the Court's view on the discovery disclosure requirements with respect to a confidential foreign witness Protocol.  *See* discussion in the text, at section D.5.

Unwind.

**4.  Kontrabecki never made a specific request to have the 2003 Protocol viewed under seal or attempted to establish that Polish law would permit such review**

Kontrabecki's assertion that Lehman could have at least made the 2003 Protocol available to the Court in camera ignores the facts that he never (a) made a specific request that the Court do so, or (b) made an effort to establish that such review could be permitted under Polish law – even though the Court in October 2003 offered him an opportunity to dispute Lehman's legal position regarding its confidentiality. Oct. 7, 2003 Hearing, 15:3 – 19:3, RJN Ex. V. By the spring of 2004 (when Kontrabecki's counsel interviewed Kukulka, and then examined him under the Polish preservation of evidence procedures), Kontrabecki and his counsel clearly knew that Kukulka had been asked hours of questions by Lehman's Polish counsel about the Share Dilutions at the police station and still did not challenge the non-production of the 2003 Protocol or argue that it bolstered Kukulka's credibility in the April 2004 Protocol.

**5.  Kontrabecki filed his own criminal complaint against Kukulka and refused to disclose any related documents to Lehman on both the ground that it was not calculated to lead to the discovery of relevant evidence and that they were confidential**

At a later date, Kontrabecki caused a criminal proceeding to be instituted against Kukulka in Poland for extortion in relation to Kontrabecki's attempted Unwind, but he has categorically refused to this day to disclose to Lehman any records of that investigation. In withholding those unspecified documents, Kontrabecki asserted both their confidentiality and that the documents were "not reasonably calculated to lead to the discovery of admissible evidence."[19] As a result,

---

[19] The formal Lehman discovery request and Kontrabecki's response read as follows:

**"REQUEST FOR PRODUCTION NO. 5**:

All DOCUMENTS evidencing, referring or relating to any proceedings, whether civil or criminal, initiated by YOU against KUKULKA in Poland, including but not limited to: (a) all pleadings filed by YOU or KUKULKA and (b) all COMMUNICATIONS between or among counsel regarding same, including, without limitation, any discussions regarding any settlement or resolution of such proceedings.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

The General Objections are incorporated into this specific response. Mr. Kontrabecki further objects to this Request on the grounds that it is not

Case: 03-03264    Doc# 1942    Filed: 12/08/09    Entered: 12/08/09 14:17:11    Page 22
of 38

neither this Court nor Lehman knows whether there is a third Protocol of Kukulka's version of the Unwind or whether any statements by Kukulka in that pending investigation contradict Kontrabecki's version of their interactions in this case from January of 2003 through the return of Lehman's security.[20]

Kontrabecki's liability has already been established, and any undisclosed statements of Kukulka in the pending Polish criminal proceeding to Kontrabecki's purported good faith efforts to accomplish the Unwind appear to have limited relevance to the lost opportunity damages phase of this proceeding. But by the same token, it ill behooves Kontrabecki to ask this Court to apply different standards to – and draw nefarious inferences from – Lehman's nondisclosure of the confidential 2003 Protocol, when Kontrabecki has persistently failed to provide the details about the pending criminal investigatory documents (*i.e.,* whether Kukulka was under penalty of perjury, who asked the questions, how long the proceeding lasted, whether the questions and answers appeared verbatim and whether there is an English translation) even after clear notice from this Court that the Court considers such information to be essential to meaningful disclosure and not prohibited by Polish law. Kontrabecki's counsel, no doubt, consider themselves not to

_____

(continued…)

> reasonably calculated to lead to the discovery of admissible evidence , seeks documents protected by the attorney-client, work product and spousal privileges, and seeks documents protected from disclosure under Polish law. Based on the foregoing objections , Mr. Kontrabecki will not produce documents in response to this Request." DEFENDANT JOHN KONTRABECKI'S RESPONSE TO PLAINTIFF LEHMAN BROTHERS HOLDING INC.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS served April 28 2008; Benvenutti Dec. Ex. 3.

[20] In a follow-up e-mail in November of 2008, Kontrabecki's counsel Tyler Gerking admitted that as a consequence of the pending criminal proceedings, Kontrabecki did not anticipate Kukulka's cooperation in the Hague convention examination. Gerking added: "The situation with the Polish criminal investigation against Kukulka has not changed. As far as we are aware, the matter is still in the investigation phase **and all documents relating to the investigation therefore are protected from disclosure** . . ." (Nov. 20, 2008 e-mail to Mark Kaufman from Tyler Gerking; Benvenutti Dec. Ex. 2 (emphasis supplied). This was five months *after* Kontrabecki filed a motion for sanctions against Lehman in June of 2008, outraged that the transcript of Kukulka's 2003 police interrogation on Lehman's fraud complaint had not been produced by Lehman's Polish counsel until June of 2007; that Lehman's American counsel had called it a report or transcript; and that Lehman's American counsel had not noted that Kukulka gave his statements under penalty of perjury and that its Polish counsel directly questioned Kukulka at the police station. Presumably the pending criminal investigation instituted at Kontrabecki's behest involved a similar protocol – but that is not disclosed by the discovery responses that Kontrabecki has provided.

Case: 03-03264    Doc# 1942    Filed: 12/08/09    Entered: 12/08/09 14:17:11    Page 23 of 38

have committed any ethical breach in their even more bare-bones discovery response on an identical issue to that on which they have accused Lehman's counsel of serious wrongdoing and baselessly seek to impugn Lehman.

### 6. Kontrabecki and his lawyers have never filed any declarations that they were misled about the nature of the Protocol and its content

Kontrabecki's lawyers knew within five days of his October 2, 2003 discovery request that the document Lehman was objected to producing in response to Request No. 2 was a transcript:

> MR. KEANE: I mean, for instance, we just heard today first time as to request number 2 that Lehman actually has a transcript of Kukulka's interview with the Polish law enforcement authorities. Apparently Lehman's counsel actually was sitting there during the interview.

Oct. 7, 2003 Transcript at 13:2-6; RJN Ex. V.

In June of 2008 when Kontrabecki filed his first sanctions motion against Lehman, he tellingly did not file *any* declaration that he or his counsel had actually been misled about the contents or nature of the Protocol by the description given by Lehman's counsel of that police record in court proceedings in the fall of 2003, or that they had no knowledge of its nature as of the time Kukulka testified at the April 2004 Protocol. Yet he made highly improbable allegations in his brief on the original sanctions motion that they were seriously misled, and repeated them here, **without any evidentiary support.** Kontrabecki asks this Court to dismiss this proceeding as a sanction without him or his former counsel *ever* being willing to swear that the "intentional deception" they accused Lehman's counsel of perpetrating ever resulted in any "deception" at all or has any basis in fact.[21]

### 7. Evidence of Kontrabecki's Independent Knowledge of the 2003 Protocol

Kontrabecki fails to mention that in September of 2003 he and Kukulka were found by this Court to be cooperating with each other with respect to the Polish bankruptcy proceedings.

---

[21] At 9:1-6, of Kontrabecki's brief, his lawyers skirt around representing the facts known to Kontrabecki himself in September of 2003 and thereafter. A careful reading of the brief reveals telling word choices tending to create the impression that both he and his lawyers were misled while obfuscating how much they actually knew about the 2003 Protocol and when they knew it.

AMENDED LBH OPP. TO MOT. TO DISMISS ADV.
PROCEEDING, CASE NO. 03-3264

17

Kontrabecki admitted in his July 2004 deposition that Kukulka met with him in Kontrabecki's Warsaw apartment in September of 2003m while Lehman was in the midst of preparing to litigate, on circumstantial evidence, that Kukulka was acting as Kontrabecki's puppet. In that deposition he stated "I was trying to get him to reach agreement with Lehman on documents and I asked him to come to my apartment to talk to me about it." July 21, 2004 Kontrabecki Depo. at 38-39; Betz Dec. Ex. L. This limited answer – given with specific permission of his counsel – was offered at a time when Kontrabecki was attempting to make only a partial Fifth Amendment waiver, and he adamantly refused to testify as to the contents of his communications with Kukulka prior to May 25, 2004 *on the ground of irrelevance*. March 17 Kontrabecki Dec.; RJN Ex. G. Though the meeting in Kontrabecki's apartment was likely after the September 2 Kukulka police station interview, no disclosure was ever made as to whether they also discussed the contents of the Protocol, its length and who did most of the questioning of Kukulka. Kukulka had signed the Protocol so he also knew that much of it was set forth in question and answer form and would likely have reassured Kontrabecki as to the answers he then gave.[22] Kontrabecki's discovery request No. 2, sent on October 2, 2003, specifically focused on all documents related to the September 2003 police interrogation of Kukulka. RJN Ex. X.[23] The request likely resulted from information Kontrabecki himself provided to his lawyers about that investigation. We do know that Kukulka's version of the facts on the subject of control was of high interest to Kontrabecki because of the monetary sanctions he faced and the fact that Kontrabecki was then preparing for either the September 16 hearing on Lehman's Motion for coercive Sanctions, or the October 10 "impossibility" hearing. But we also know more. On October 1, 2003, Kontrabecki's attorney Dean Gloster sent an e-mail to John Aldridge – the day before the document request on

---

[22] If, as Kontrabecki has asserted as a mitigation defense, Kukulka was upset by having been charged by Lehman with Polish crimes, it would be incredible for Kukulka not to have told Kontrabecki in detail what had just happened in the police station interview, particularly given how his statements in that interview were so clearly tailored to support Kontrabecki's incredible version of events.

[23] Request No. 2 sought:

> All documents that record, reflect or otherwise evidence communications, including without limitation interviews and meetings, between Polish law-enforcement authorities, including without limitation prosecutors, police, investigators and their respective agents, on the one hand, and Piotr Kukulka, including agents purporting to act on his behalf on the other hand.

the police investigation was sent – that referred to Gloster having heard that Lehman's Polish counsel were present at the police station – information Gloster presumably obtained from his client. Benvenutti Dec. Ex. 4. The failure of Kontrabecki and his counsel in their 2008 and 2009 sanctions motions to reveal what they knew about the Protocol from the fall of 2003 through the summer of 2004 – and when they learned it – speaks volumes. If they had fully informed the Court of what they knew and when they knew it, it would likely have undermined their claim that Kontrabecki was seriously misled to his detriment by Lehman's counsel in 2003 and 2004 as to the relevance and contents of the 2003 Protocol.

### E. Kontrabecki Offered Kukulka's April 2004 Protocol Into Evidence With Knowledge That Lehman's Counsel Covered the Same Territory in the September 2003 Protocol

Kontrabecki states in his brief that "by suppressing the September 2003 Protocol, Plaintiff's counsel was able to make arguments in urging the Court not to admit the April 2004 Protocol that would have been demonstrably unacceptable had the Court *or Mr. Kontrabecki* known the contents of the earlier Protocol." Kontrabecki Sanctions Memo, 33:20-21 (emphasis added). But Kontrabecki cannot be heard to complain about Lehman's *unsuccessful* efforts to keep out the April 2004 Protocol. It also appears to be no coincidence that Kukulka publicly testified on many of the same topics in the April 2004 Protocol as the confidential statements he made in the 2003 Protocol. Rather, the April 2004 Protocol represented Kontrabecki's efforts to get before this Court the same statements he likely already knew Kukulka had made in the confidential interrogation. This was likely because Kontrabecki and his lawyers realized the 2003 Protocol was inadmissible hearsay and subject to strict confidentiality. Kontrabecki's attorneys admittedly interviewed Kukulka in the spring of 2004 prior to, and in anticipation of, his public testimony in which Kukulka stated he had previously been grilled by Lehman's Polish counsel. The Court overruled Lehman's objections that the public testimony was not word for word, did not permit document discovery beforehand and did not otherwise meet the standards of reliability of an American deposition. The Court then proceeded to determine that Kukulka's April 2004 testimony was not credible. See May 24, 2004 Transcript at 17:18-23; RJN Ex. W.

Even though Kukulka's April 2004 testimony was unpersuasive and Kontrabecki was headed to jail for contempt, his counsel did not raise *any* issue with the Court in the spring or summer of 2004 about the admissibility of the 2003 Protocol to bolster the credibility of Kukulka's April 2004 testimony. Nor did Kontrabecki ever ask the Polish prosecutor to permit disclosures or challenge Lehman's position that Polish law prohibited disclosure of the 2003 Protocol for review under seal as invited to do so by this Court. The silence of Kontrabecki and his counsel at that critical time is the dog that did not bark. Even though Kontrabecki's counsel knew by April 2004 (if not by October 1, 2003) that Lehman's Polish counsel did most of the questioning at the 2003 police station interview and that Kukulka responded similarly to his April 2004 testimony, these facts did not alter their assessment that the earlier 2003 Protocol was a confidential investigative document that could not be disclosed for use in this proceeding. Not until 2008 did Kontrabecki's counsel come up with a retroactive argument to the contrary – which this Court flatly rejected in its Feb. 17 Decision.

**F.    Kontrabecki Has Offered No New Evidence to Justify Reconsideration of this Court's Findings Exonerating Lehman on the Protocol Issues**

Because the Court found that Lehman was not responsible for any of the claims against its counsel related to the Protocol, there appears no reason to address in detail the points raised against Lehman's counsel on pages 20 through 24 of his brief. Those can be addressed by its counsel if need be in a late proceeding. For purposes of defeating this motion, we note that this Court has already considered and rejected the argument that Kukulka's April 2004 testimony on the Share Dilutions would have been bolstered by consideration of his inadmissible hearsay statements to similar effect in the 2003 Protocol. Feb. 17 Dec. at 6:6-17; RJN Ex. D. There is no declaration offered here of any newly discovered facts bearing on this issue, and the Court's prior determination remains applicable and controlling.

**G.    The Issue of Control Has No Bearing on Lehman's Lost Opportunity Damages Claim**

After the issue of control was litigated and relitigated, this Court ruled the issue of control of Kukulka irrelevant to Kontrabecki's defense to Lehman's lost opportunity damages claim for

the January 2003 torts and stay violation.  October 11, 2007 Mem. Dec. at 3:26-4:11 [Docket

No. 1525] RJN Ex. N.  We note that in this section as well as others of his brief, Kontrabecki

asserts that Lehman concealed evidence, without offering any proof that Lehman did anything of

the sort.  No factual grounds for reconsideration have been raised.

### H.     Kontrabecki Can Claim No Prejudice From Any Delay in Receiving the 2003 Protocol After Its Confidentiality was Lifted

The 2003 Protocol remained confidential until the investigation was concluded, which did

not occur until June 2005, and Kontrabecki has produced no evidence that Lehman knew that fact

until long after he was released from incarceration. As this Court found, "Any failure to produce

the Protocol after the end of the incarceration  . . . is harmless." Feb. 17 Dec., pp. 14:23 - 15:16

No reason to reconsider that finding has been offered.

### I.     In Seeking Terminating Sanctions, Kontrabecki Improperly Relies on Void Findings, Presents No Supporting Evidence, and Offers No New Facts to Justify Reconsideration of the February 17 Decision

Kontrabecki lists six bullet points in his brief at pages 27-28, that he claims support the

bad faith of Lehman's counsel, but again fails to establish why the Court should presume

nefarious intent absent *any* evidence of scienter (or, as to the first, second and fourth points, any

evidence at all).  Most of the six bullet points concern normal litigation activities, and whether

considered individually or in combination none of them suggest, much less prove, that Lehman's

counsel (or the Trustee, as regards his decision to make a criminal referral as required under 18

U.S.C. §3057(a)), engaged in or intended anything other than appropriate representation of their

client or performance of the Trustee's statutory duties.[24]  Kontrabecki's only purported

---

[24] One example illustrates the absurd and frivolous nature of Kontrabecki's charges.  In asserting that *Lehman* purposely buried the 2003 Protocol in its 2007 production of documents (Kontrabecki Sanctions Mem. at 28:12-13), Kontrabecki once again attributes wrongful motive to Lehman without any evidence whatsoever to back up either that charge or the underlying charge of its attorneys' wrongful motive. To the contrary, *the opposite has already been established in two declarations filed sixteen months ago*. Production of the documents that included the 2003 Protocol was handled by lawyers and paralegals at McKenna Long & Aldridge. David Gordon, one of two associates of that firm charged with the lengthy review process entailed in responding to Kontrabecki's blunderbuss 2006 document request, described the process and explained in detail how there was nothing unique about the manner in which the 2003 Protocol was retrieved and produced as part of tens of thousands of other requested documents.  Aug. 1, 2008 Gordon Decl. at ¶10; RJN, Ex. O.  Kaufman also attested that he played no role in handling the production of the Protocol Minutes and had no "...awareness

Case: 03-03264   Doc# 1942   Filed: 12/08/09   Entered: 12/08/09 14:17:11   Page 28 of 38

"evidence" of wrongful intent by anyone is his blatantly improper reliance on the Court's January 13, 2009 Memorandum Decision for the assertion that "the Court determined that . . . Plaintiffs' counsel breached their duties of candor and truthfulness to both the Court and Mr. Kontrabecki. . . ." Kontrabecki Sanctions Memo, 27:19-20 (RJN Ex. I), citing January 13, 2009 Decision, 26:3-4. ***But the record did not support such a finding and the Court rescinded that determination!*** As Kontrabecki plainly knows, the Court's *Amended* Memorandum Decision of February 17, 2009 modified the January 13 Decision specifically to eliminate any finding of intentional wrongdoing and any determination of breach of any ethical obligations on the part of Lehman's counsel, who were not parties to that proceeding. Kontrabecki's citation of or reliance on any part of the superseded January 13 Decision – especially the portion that lies at the heart of the Court's explicit purpose in amending its decision – is outrageous, typifies Kontrabecki's disreputable approach to this Motion (and his strategy of attacking Lehman's counsel), and itself violates Rule 5-200 of the California Rules of Professional Conduct ("In presenting a matter to a tribunal, a member: . . . (C) Shall not intentionally misquote to a tribunal the language of a . . . decision; (D) Shall not, knowing its invalidity, cite as authority a decision that has been overruled. . . .").

All of the matters about which Kontrabecki complains relate to the conduct of Lehman's counsel (or the Trustee), and there is no evidence Lehman itself was involved, and hence no reason – and Kontrabecki certainly offers none – for the Court to depart from its prior decision that Lehman should not be sanctioned for arguable misconduct of its counsel. Lehman's counsel are fully prepared to address the lack of merit of all of these claims in a separate hearing. But assuming *arguendo* that any basis existed for asserting that there was anything improper about them, none of these matters have any nexus to Kontrabecki's ability to defend the damages claims, or indeed, any particular significance at all. These unsupported and irresponsible

_____

(continued…)

whatsoever at that point [February of 2008] that production of the Minutes had been an issue in the October 20, 2003 Impossibility Hearings," which occurred four years before and which Kaufman had not attended. Aug. 1, 2008 Kaufman Decl. at ¶5, RJN Ex. P. In typical fashion, Kontrabecki not only ignores these declarations, but offers not a shred of evidence to the contrary, while recklessly accusing Lehman and its counsel of intentional misconduct that these declarations disprove.

allegations fall light years short of "a manipulation of the judicial process that was fraudulent, unethical and a violation of the basic notion of fairness that is the bedrock of our legal system" as Kontrabecki charges – without evidence. Kontrabecki Sanctions Memo, p. 29:3-4.

## III.  ARGUMENT

All argument in Kontrabecki's brief addressed to the issue of control is irrelevant to the damages trial. October 11, 2007 Memorandum Decision at 3:26-4:11; RJN Ex. N. All argument predicated on statements made by Kukulka in the 2003 Protocol (*see* Kontrabecki Sanctions Memo, pp. 17:22-28, 18:1-7) relies on inadmissible hearsay and must also be disregarded. Feb. 17 Dec., p. 26. All reliance on "findings" in the superseded decision of January 13, 2009 (*see* e.g. Kontrabecki Sanctions Memo. pp. 2:11-12, 16:25) should be stricken. It is void and not citable. *See* California Rule of Professional Conduct 5-200 (D).

### A.  No Egregious Conduct by Lehman Has Been Established to Warrant Any Sanctions.

Lehman has violated no court orders. Kontrabecki never even made any motion to compel discovery of the two documents he now claims were critical to his case, or any discovery request that, fairly read, encompassed the Leigh Letter. Despite repeated scurrilous attacks on Lehman's counsel and on Lehman and the Trustee, Kontrabecki has not supported this motion with any declaration he or his counsel were misled. Instead, by sheer chutzpah, Kontrabecki has sought throughout this brief to bootstrap bald claims of intentional deception, concealment and suppression by Lehman's counsel into baseless claims against Lehman itself. That does not fly.

First, as discussed in section III.B below, to justify dismissal as a sanction under their inherent authority – Kontrabecki's legal basis for this motion – courts require egregious misconduct of the party, not its counsel. This Court has already found that Lehman bore no responsibility for the claimed duty of candor violations regarding the 2003 Protocol. Feb. 17 Dec. at 25:20-22; RJN Ex. D. No factual or legal basis – none – has been presented for reconsidering that ruling.

Furthermore, the reasons that the January 13 decision was superseded were that it did not address the requirement of scienter in all the alleged rule violations that Kontrabecki asserted

against Lehman's counsel [*see In the Matter of Farrell*, 1 Cal. State Bar Ct. Rptr. 490, 497 (Review Department 1991) citing *Conroy v. State Bar*, 53 Cal. 3d 495, 501-502, 508 (1991)],[25] and that Lehman's counsel were not parties. Since this Court found that Lehman's counsel demonstrated no bad faith or egregious conduct within the meaning of the Bankruptcy Code, it is unlikely that the same allegations would lead this Court to find intentional violations of the State Bar Rules when the attorneys have their day in court.

Nor is there evidence that Lehman intentionally deceived Kontrabecki because its counsel did not produce a copy of the Leigh Letter in discovery. Kontrabecki did not explicitly ask for any documents related to the American criminal proceeding, in stark contrast to his request regarding the 2003 Protocol ("communications, including without limitation interviews and meetings, between Polish law-enforcement authorities . . . and Kukulka . . . ."). Indeed, rather than being critical to Kontrabecki, he declared under oath earlier this year that he decided to waive the Fifth Amendment in July of 2004 without knowing the status of the criminal proceeding, an admission which negated causation by Lehman's counsel or Lehman itself. Sept. 3 Dec. at 5:1-23. And, consistent with his pattern throughout this Motion, Kontrabecki presents no evidence of involvement by Lehman in any matters pertaining to the Leigh Letter.

## B. Terminating Sanctions Are A Drastic Remedy Of Last Resort And Inapplicable Here

Terminating sanctions are a drastic and rare remedy for extreme, egregious client misconduct that bears directly on the merits of the litigation; and most courts also require

---

[25] Negligent misrepresentation is not sufficient. (*See In the Matter of Respondent K,* 2 Cal. State Bar Ct. Rptr. 335, 353 (Review Dept. 1993) (respondent's omission in describing the status of the attorney's fee award did not constitute an act of deception in violation of section 6068 (d) or section 6106); *Moriarty v. State Bar,* 4 Cal. State Bar Ct. Rptr. 9, 15 (Review Dept. 1999) finding the respondent culpable of moral turpitude due to gross negligence in violation of section 6106, but declining to decide that the respondent also violated sections 6068 (d) and Rule 5-200 on the record before that court out of concern that "whether [the charged] violations of 6068(d) and rule 5-200 must rest on findings of specific intent to deceive" and refusing to follow *In the Matter of Harney,* 3 Cal. State Bar Ct. Rptr. 266 (Review Dept. 1995) (finding violations of sections 6068 (b) and (d), 6106 and former rule 7-105 [current rule 5-200] through gross negligence based on attorney's failure to reveal to his client and the probate judge likely statutory limitations on attorney's fees, a subject on which Harney was a leading expert). Here, Lehman's counsel dispute that they made *any* misrepresentation, negligent or otherwise, and are prepared to offer evidence in a separate sanctions proceeding of their good faith. In such proceeding, as part of their defense, this Court has indicated they will be free to relitigate the duty to disclose the Leigh Letter, which duty is a necessary predicate to that sanctions claim. (See Vapnek Treatise at § 8:232 (2008), cited in fn. 8 above.)

Case: 03-03264    Doc# 1942    Filed: 12/08/09    Entered: 12/08/09 14:17:11    Page 31 of 38

prejudice to the opposing party's ability to litigate the merits of the case. Such sanctions are imposed to defeat the public policy strongly favoring resolution of a case on its merits only when the client's misconduct cannot be remedied by a less drastic sanction. *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 381 (9th Cir. 1988) (court must, before dismissing an action under its inherent powers, consider less drastic sanctions).

In seeking terminating sanctions here, Kontrabecki purports to rely on both the Court's inherent authority and Fed. R. Civ. Proc. 41(b). *See* Kontrabecki Sanctions Memo at 30:23-25. Rule 41(b) is inapplicable by its terms. It authorizes involuntary dismissal if "the plaintiff fails to prosecute or to comply with these rules or a court order. . . ." Kontrabecki's motion fails to cite any failure by Lehman or its counsel to comply with any rule or court order in this case,[26] nor has the Court found any such violation by Lehman or its counsel. *See Halaco Eng'g Co. v. Costle*, 843 F.2d at 380 n.1; *see also Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1064-65 (9th Cir. 2004) (dismissal under Rule 41(b) improper absent disobedience of court order). Where dismissal is sought for failure to comply with discovery rules or orders, Rule 37, not Rule 41(b), provides the proper source of authority for dismissal. *Societe Internationale pour Participations Industrielles et Commerciales, S.A. v Rogers* 357 U.S. 197, 207 (1958). Kontrabecki's motion does not (and cannot) seek dismissal under Rule 37, however, since Rule 37 similarly provides no authority for dismissal absent violation of a discovery order under Rule 37(b) or a failure to serve a written response to a discovery request under Rule 37(d), neither of which has occurred in this case. *See Halaco,* 843 F.2d at 379-380.[27]

Within the Ninth Circuit, it is well recognized that dismissal under a court's inherent powers is justified only in "extreme" circumstances. *Halaco,* 843 F.2d at 381; *Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 589 (9th Cir. 1983), such as where a party has "willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice" so as to seriously undermine "orderly judicial administration of justice and the integrity

---

[26] The third stated ground under Rule 41(b), failure to prosecute, warrants no discussion.

[27] Dismissal as a sanction under Rule 37 also requires consideration and careful weighing of the five factors identified at the end of the next paragraph of text. *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990).

Case: 03-03264    Doc# 1942    Filed: 12/08/09    Entered: 12/08/09 14:17:11    Page 32
of 38

of the court's orders". *Anheuser-Busch, Inc. v. Natural Beverage Distrib.*, 69 F. 3d. 337, 348-49 (9th Cir. 1995); quoting *Wyle,* 709 F.2d at 589 (9th Cir. 1983); *Halaco,* 843 F.2d at 381; *United States v. Nat'l Med. Enters., Inc.,* 792 F.2d 906, 912 (9th Cir. 1986); *Fjelstad v. American Honda Motor Co.,* 762 F.2d 1334, 1338 (9th Cir. 1985); *Phoceene Sous-Marine, S.A. v. U. S. Phosmarine, Inc.,* 682 F.2d 802, 806 (9th Cir. 1982). Moreover, "[f]or dismissal to be proper, the conduct to be sanctioned must be due to 'willfulness, fault, or bad faith.'" *Anheuser-Busch, Inc.,* 69 F. 3d. at 348; *citing Henry v. Gill Indus., Inc.*, 983 F. 2d 943, 946-47 (9th Cir. 1993) (dismissal sought under Rule 37 for "repeated and flagrant" discovery abuses), *quoting Fjelstad,* 762 F.2d at 1337. And due process concerns further mandate the most critical criterion for the imposition of a dismissal sanction – that the misconduct must relate to matters in controversy in such a way as to interfere with the rightful decision of the case. *Anheuser-Busch, Inc.,* 69 F. 3d. at 348; *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 705-07 (1982)(rule is rooted in general due process concerns); *Fjelstad,* 762 F.2d at 1338; *Wyle,* 709 F.2d at 591; *Halaco,* 843 F.2d at 381-82 (reversing dismissal where alleged misconduct peripheral to merits of case); *Phoceene,* 682 F.2d at 806 (holding entry of default violated due process because party's deception was "peripheral" to merits of the controversy). There must be a nexus between the party's actionable conduct and the merits of the case. *Halaco,* 843 F.2d at 381, *citing Fjelstad,* 762 F.2d at 1342, and *Wyle,* 709 F.2d at 591. Finally, before imposing the harsh sanction of dismissal under its inherent powers, the court must weigh the following factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions;[28] (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Anheuser-Busch, Inc.,* 69

---

[28] With respect to dismissal under a court's inherent authority, the Ninth Circuit has acknowledged that a split in authority exists as to whether a finding of prejudice is required. (*See In re Napster*, 462 F. Supp. 2d 1060, 1077-78 (N.D. Cal. 2006); *United States v. Nat'l Med. Enters., Inc.*, 792 F.2d at 914 (requiring prejudice); *but see Halaco Eng'g Co. v. Costle*, 843 F.2d at 382 (holding the district court did not abuse its discretion in failing to consider prejudice as a factor for dismissal). In *Anheuser-Busch*, the Ninth Circuit declined to settle the split in authority on this issue because severe prejudice to *Anheuser-Busch* from the opposing party's intentional misconduct was evident. *Id.*

F. 3d. at 348.[29]

*Anheuser-Busch* is the primary case upon which Kontrabecki mistakenly bases his argument for the draconian sanction he seeks here. Kontrabecki Sanctions Memo pp. 1, 29-30, 34. On page 29 of his brief, he cites that Ninth Circuit case as authority for the proposition that concealment of material, relevant information "by a party's attorney is grounds for dismissal of claims as a sanction for the misconduct." He further asserts that the Ninth Circuit affirmed "dismissal of counterclaim(s) pursuant to the court's inherent power to sanction pervasive improprieties committed by defendant's counsel, including willfully withholding documents." *Id.* at 30:2-4.

That is a patent mischaracterization of controlling precedent. In *Anheuser-Busch*, the counterclaim was dismissed ***due to the pervasive misconduct of the client herself*** over a three year period. The Ninth Circuit found that evidence of key financial information in the exclusive possession of the party was intentionally withheld from discovery on the false ground that it had been destroyed in an arson fire. Without that information, *Anheuser-Busch* was seriously handicapped in presenting its case on the merits. Here, Kontrabecki claims that Lehman was in the sole possession of key evidence on the Unwind. To the contrary, both he and Kukulka were the direct sources of that information and chose not to testify at critical times about their conduct. The information available to Lehman's counsel about which Kontrabecki complains was a copy of an inadmissible and non-disclosable confidential statement from Kukulka that was largely duplicated by his discredited oral testimony in April of 2004. The Leigh Letter was never evidence admissible in this proceeding, but simply a statement about the current lack of resources to pursue bankruptcy fraud, which was likely no surprise to practitioners in the field based on their experience. In any event, Kontrabecki changed his mind and decided to waive the Fifth Amendment altogether in July of 2004, which negated causation. Sept. 3 Dec. at 5:1-23; RJN Ex. E. Furthermore, he has failed to show how either of these documents has any bearing on his defense to the damages claim for his intentional torts or willful stay violations – they manifestly

---

[29] Kontrabecki has made no effort to address these factors. They manifestly do not support dismissal, or any other sanction against Lehman.

Case: 03-03264    Doc# 1942    Filed: 12/08/09    Entered: 12/08/09 14:17:11    Page 34
of 38

do not.

In *Anheuser-Busch,* the Ninth Circuit upheld terminating sanctions only after finding a close nexus of the sanction to the misconduct and analyzing why that sanction of last resort was appropriate against the client. The misconduct of her attorney – repeated intentional violations of the Court's in limine order – was far more egregious than the alleged violations here, but still did not result in dismissal of the client's case. Rather, the attorney's misconduct resulted in a new trial before a second jury on the grounds the first jury was improperly swayed by passion or prejudice. *Anheuser-Busch, Inc.*, 69 F.3d at 345-347. Kontrabecki does not address the requirement of a close nexus before terminating sanctions can be considered. *See Anheuser-Busch, Inc.*, 69 F.3d at 355 (issuing terminating sanctions for intentionally withholding documents that "handicapped" opposing party from prosecuting case); *Halaco Eng'g Co.*, 843 F.2d at 381 ("The most critical criterion for the imposition of a dismissal sanction is that the misconduct penalized must relate to matters in controversy in such a way as to interfere with the rightful decision of the case"); *In re Napster*, 462 F. Supp. 2d at 1074-75. ("In order for default sanctions to be imposed . . . there must be a nexus between Hummer's conduct and the merits such that the conduct interferes with the rightful decision of the action.") Kontrabecki does not support the current draconian motion with *any* declaration of recently discovered facts, nor with any law supporting reconsideration of either the Feb. 17 Decision or the Sept. 3 Decision. Without such a showing, reconsideration is not warranted. (*See School Dist. No. 13 Multnomah County Oregon v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993); *United States v. James*, 915 F. Supp. 1092, 1098 (S.D. Cal. 1995).

*Abraham v. County of Greenville* likewise does not support dismissal of a client's case for the attorney's conduct. It was the party – the county – in that Fourth Circuit case that was held accountable for withholding a smoking gun memorandum that resulted in a mistrial and grant of a new trial. The second jury found intentional misconduct by the county on the merits. Kontrabecki also misstates the holding in *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380 (1993) that "in certain contexts clients must be held accountable for the acts and omissions of their attorneys." Kontrabecki Sanctions Memo, 1:30. *Pioneer Investment Services* involved the

scope of a bankruptcy court's discretion to allow a late-filed claim. The Supreme Court determined that respondents' failure to file their proofs of claim prior to the bar date was excusable. *Id.* at 397. The **holding** in *Pioneer* was to grant the client the relief it requested despite its attorney's mistake about the filing deadline for a creditor's claim. In so ruling, the Court distinguished cases like *Link v. Wabash R.R. Co.* 370 U.S. 626 (1962) [dismissal due to failure of plaintiff to prosecute its claim] and *Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) [dismissal due to failure to respond to interrogatories.] The last thing of which Kontrabecki – or this Court – would accuse Lehman's counsel is failure to prosecute Lehman's case.

Kontrabecki also fails to state the holding in *Schilling v. Walworth Co. Park & Planning Comm'n*, 805 F.2d 272 (7th Cir. 1986), which involved a pro se litigant. The 7th Circuit found the district court erred in dismissing the case without considering lesser sanctions, stating "The sanction of dismissal with prejudice must be infrequently resorted to . . . [A] dismissal with prejudice is a harsh sanction which should usually be employed only in extreme situations, when there is a clear record of delay or contumacious conduct, or when other less drastic options have proved unavailing." (*Id.* at 275.)

    **C.**    **The American Judicial System Strongly Favors Decisions on the Merits, But Also Recognizes Privileges from Discovery and Evidence**

Kontrabecki argues that "the American judicial system is founded upon a full airing of the facts and pursuit of the truth" to promote a court's decision on the merits, rather than "a distorted and incomplete view of events upon which to render a decision." (Sanctions Memo 2:19-22.) While it is true that decisions on the merits are strongly favored – a policy which militates *against* granting the draconian sanctions sought here – Kontrabecki ignores obvious policy exceptions which often deprive a court of a full record upon which to rule.

As Kontrabecki well knows, the right to invoke the Fifth Amendment conceals relevant information from discovery or evidence. Public policy upholds an individual's right not to be forced to incriminate himself even if criminals thereby get away with their crimes and related

civil records are left distorted or incomplete.[30]  Documents that are part of a confidential criminal proceeding are also not admissible or even discoverable – like the 2003 Protocol and like the documents Kontrabecki is currently refusing to produce with respect to the pending criminal proceeding in Poland against Kukulka.

Likewise, the attorney-client privilege withholds relevant information though that privilege can be waived by conduct, such as when a litigant seeks to hide behind it while using it as a sword in litigation where discovery of the attorney's advice is critical to disproving the litigant's claim.  Parties in Kontrabecki's position have thus been forced to choose between invoking the attorney client privilege and dismissing their claim, or waiving the privilege to maintain the claim, as a matter of fundamental fairness to the opposing party. (*See Kaiser Found. Health Plan, Inc., v. Abbott Labs., Inc*., 552 F.3d 1033, 1042 (9th Cir. 2009); C*hevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162 (9th Cir. 1992) ("The privilege which protects attorney-client communications may not be used both as a sword and a shield."); *United States v. Amlani,* 169 F.3d 1189, 1195-96 (9th Cir. 1999); *see also United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991) (same); *see generally* Vapnek Treatise 7:364 [fundamental fairness]; 7:367 [advice of counsel a defense]; 7:368 [where client puts own knowledge at issue and attorney's knowledge is imputed to client].  Courts will not permit a litigant to claim the privilege while pursuing a claim for which the privileged information is necessary to the other party's defense.[31]  The "overarching

---

[30] Kontrabecki excoriates Lehman's counsel (Kontrabecki Sanctions Memo at 7:13 – 8:4) for urging the Court to draw negative inferences regarding Kontrabecki's invocation of the Fifth Amendment in 2003 and 2004, which Lehman's counsel had every right to do on its client's behalf.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318-19 (1976).  Kontrabecki could have avoided that inference by simply waiving the Fifth Amendment and testifying fully, giving Lehman a simpler path to follow by cross-examining him on the Share Dilutions and his Unwind efforts than the circumstantial case his silence forced Lehman to present.

[31] In footnote 6 of its Sept. 3 Decision, this Court made the following finding on claimed waiver of the attorney-client privilege: "The court has also been presented with the question of whether Kontrabecki waived his attorney client or work product privileges by submitting his April 21, 2009, declaration. The court agrees with Kontrabecki that there was no such waiver." [6:26-28]. Earlier in that same footnote, the Court stated, "The questions before the court are not about unfiled sanctions motions, on which no opinion is being expressed." [5:26-27].  Lehman is not seeking reconsideration of that ruling regarding the April 21, 2009 declaration, but pointing out the unfairness of Kontrabecki in his current Motion both asserting the attorney-client privilege as a *shield* to his decision to invoke the 5th Amendment and seeking terminating sanctions as a lethal *sword* against Lehman's damage claim while keeping secret the actual discussions he had with his counsel on whose advice he also claims to have relied in invoking the Fifth Amendment.

consideration is whether allowing the privilege to protect against disclosure of the information would be 'manifestly unfair' to the opposing party." *Home Indem. Co. v. Lane Powell Moss and Miller*, 43 F.3d 1322 at 1326 (9th Cir. 1995) (quoting *Hearn v. Rhey* F.R.D. 574, 581 (E.D. Wash. 1975)). To the extent this record has not reflected everything Kontrabecki would have wished to say on the subject of his Unwind efforts, he has only himself to blame. (Sept. 3 Dec. at 5:1-23; RJN Ex. E).

## IV.  CONCLUSION.

This scurrilous and abusive motion is also frivolous – Kontrabecki has provided no factual or legal support whatsoever for any sanction against Lehman, and certainly no argument why terminating sanctions should be imposed to prevent Lehman from pursuing on the merits its claim for eight figure damages for his intentionally tortious conduct. The motion should be denied; the Court should grant such other relief as it considers appropriate.

Dated: December 8, 2009

JONES DAY
McKENNA LONG & ALDRIDGE LLP

By: /s/ *Peter J. Benvenutti*
Peter J. Benvenutti

Attorneys for Plaintiff
LEHMAN BROTHERS HOLDINGS INC.

SFI-624651v8
Last Edited: 12/8/09